# Fownes Trust

*Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for accountant.

*Goehring & Collins,* for guardian ad litem.

RAHAUSER, J., April 1, 1955.—The third and final account of the trustees of the above estate came before the court January 18, 1955.

The deed of trust provides, inter alia, as follows:

"(a) The Trustees shall pay in convenient periodic installments not less frequently than quarterly the net income of the trust estate to C. B. Fownes, son of Grantor, during his life.

"(b) The Trustees shall have full power and authority in their discretion to distribute to said C. B. Fownes from time to time a portion or portions of principal in additon to income above provided for to the end that said C. B. Fownes may receive sufficient sums for maintenance in comfort and security with due provision for sickness or emergency of any kind.

"(c) The said C. B. Fownes shall have the right and power to appoint by his last will and testament the uses and purposes and manner of distribution and persons to be entitled to the principal remaining of the trust estate upon his death.

"(d) In the event that said C. B. Fownes dies without having exercised the power of appointment heretofore given the trust shall terminate upon his death and the Trustees shall pay the principal remaining of the trust estate share and share alike to the grandchildren of Grantor then living or their issue per stirpes."

The income beneficiary of the trust fund, C. B. Fownes, died March 28, 1954. By reason of the death of C. B. Fownes the trust terminates and is distributable in accordance with his last will and testament. Frank B. Ingersoll, W. E. Motheral and The Mellon National Bank and Trust Company are both the trustees under the deed of trust and the executors of the will of C. B. Fownes.

In the audit of the trust certain questions arose pertaining to the apportionment of certain stock dividends between the estate of C. B. Fownes, deceased life beneficiary, and the trust remaindermen. In paragraph 13 of the petition for distribution the Trustees aver that they had determined through an apportionment study that an equitable apportionment was in order

and that the amount of stock, at indicated carrying values, and cash are apportionable to the estate of C. B. Fownes, deceased, as follows:

| | |
|---|---|
| 58 24/100 shares Caterpillar Tractor Company, common stock at $26.97873076 | $ 1,571.24 |
| 715 59/100 shares Gulf Oil Corporation, capital stock at $27.993 | 20,031.51 |
| 4 46/100 shares Standard Oil Company of New Jersey, capital stock at $32.009785 | 142.76 |
| Proceeds sale of 20/100 shares Gulf Oil Corporation, capital stock sold 1/19/54 at $44.875 | 8.98 |
| 629 45/100 shares Texas Company, Del., capital stock at $25.79208 | 16,234.83 |
| 240 shares Insurance Company of North America, common stock at $28.98993 | 6,957.58 |
| Net proceeds 373 9/100 shares American Viscose Corporation, common stock sold 5/26/54 | 13,092.42 |

The trustees, in calculating the intact value of the corpus of the securities held under the deed of trust, used the purchase price of certain stock and the book value of the other stock in their computations.

The will of C. B. Fownes was executed November 22, 1953, and republished by codicils executed December 10, 1953, and January 29, 1954. The will executes the power of appointment given in the deed of trust to C. B. Fownes. It makes provision for certain unascertained interests.

The court appointed a trustee ad litem to represent the interests in posse. All parties in interest are before the court in the adjudication of all problems presented by this audit.

The trustee ad litem, March 8, 1955, filed exceptions to the third and final account of the trustees. The report of the trustee ad litem covered the management of the estate and his exceptions, which relate to the extraordinary dividends of certain securities, are as follows:

1. The trustees failed to transfer to income-personalty and to apportion and distribute to the estate of

C. B. Fownes, life tenant, 473.36 shares of American Viscose Company.

2. The trustees failed to transfer to income-personalty and to apportion and distribute to the estate of C. B. Fownes, life tenant, 222.30 shares of Standard Oil Company of New Jersey.

3. The trustees failed to transfer to income-personalty and to apportion and distribute to the estate of C. B. Fownes, life tenant, 662.46 shares of Texas Company.

4. The trustees failed to transfer to income-personalty and to apportion and distribute to the estate of C. B. Fownes, life tenant, the sum of $125, representing the proceeds of Phillips Petroleum Company rights.

The deed of trust under consideration contained certain provisions relating to the power of the trustees in the apportionment of such dividends. The fourth paragraph of the deed of trust pertains to this subject and provides as follows:

". . . Any and all cash dividends, whether ordinary or extraordinary, shall be considered as income, and any and all stock dividends or other increments of value shall be considered as principal or as income, either or both, in the discretion of the Trustees. The Trustees shall have the power to purchase securities at a premium and charge the same against principal or income, or partly against principal and partly against income, as may be deemed best by the Trustees in their discretion, and securities purchased at a discount shall be treated in like manner. In any case in which the Trustees are required to divide the principal of the trust estate in parts or shares, or to distribute the same, they are authorized and empowered, in their discretion, to make divisions or distribution in kind, or partly in kind and partly in money, and their judgment concerning the values for the purpose of such

division or distribution shall be binding and conclusive on all parties interested therein."

The petition for distribution does not aver that the trustees acted under the above provision of the deed of trust in making the apportionment of any dividends. The effect of this provision will be discussed later.

The deed of trust provides that in construing the deed of trust the construction used by the trustees shall be final. Section 13 of that instrument provides:

"This Trust has been accepted by the Trustees in the State of Pennsylvania, and all questions pertaining to its validity shall be determined in accordance with the laws of that State. The Trustees may supply any defects or omissions which may be deemed necessary in their discretion to enable the carrying out of the general purpose of this trust and are authorized and empowered to construe this Trust Indenture, and such construction thereof shall be final and conclusive as regards all parties."

The will of C. B. Fownes approved the management of the trust estate. The nineteenth section of his will states:

"I have annually approved the investments made by the trustees of the C. B. Fownes trust and their acts in all respects as trustees in the management of the estate. My approval thereof shall be binding and conclusive upon my appointees and no appointees shall have the right to question the same."

The trustee ad litem has made a survey of the corporate structure of the corporations whose stocks are subjects of his exceptions. Counsel for the accountant states that the report of the trustee ad litem correctly states the relevant facts as to the Texas Company and the Standard Oil Company of New Jersey stock.

Before considering the details as to the various dividends involved it is necessary to consider several preliminary questions:

1. Does article 19 of the will of C. B. Fownes affect the apportionment of extraordinary dividends of securities held by the trustees under the deed of trust?

2. Does the fourth paragraph of the deed of trust, relating to dividends and authorizing the trustees to make such distribution of the same as they in their discretion deem proper, control the apportionment in this estate?

3. Where the trustees under the deed of trust purchased corporate stock upon which a stock dividend was later declared, is the intact value to be preserved for the remaindermen the purchase price which the trustees paid for the stock or the book value thereof at the time of purchase?

As to the first question above all apportionable stock dividends were received prior to the date of the life tenant's will. However, there is nothing in the record to indicate that the life tenant's approvals were made with full knowledge of his rights and of the material facts concerning the dividends heretofore set forth.

The court is of the opinion that the nineteenth provision of the will of C. B. Fownes has no application to the adjudication of the apportionable dividends in the C. B. Fownes trust in the absence of specific proof of the approval of the trustees' method of dividend apportionment.

The A. L. I. Restatement of the Law of Trusts takes this view and the Supreme Court of Pennsylvania expressed itself as being in accord with the view of the restatement in Bard's Estate, 339 Pa. 433 (1940), where the trustee contended that life tenants were precluded by acquiescence from surcharging the trustee for failure to apportion a stock dividend. In this case the court stated as follows at page 436:

"The trustee urges that the life tenants acquiesced in the retention as principal of the proceeds of the subscription rights and the stock dividend, because they

failed to object, or to take steps to secure an adjudication of their rights. But there is nothing in the record to support the conclusion of the court below that the life tenants had knowledge of the stock dividend and subscription rights. The trustee did not file an account until 1938, and there is no proof or admission that statements were rendered to the life tenants *informing them of these items, or of the circumstances affecting them.* Their acceptance of income without objection cannot be regarded as acquiescence *in the absence of any evidence that they knew its source, or understood its nature.* In Card's Est. (No. 2), 337 Pa. 82, where a similar situation was before us, we said (p. 88) : 'There was no acquiescence on the part of such beneficiaries, because of their insufficient knowledge of the facts concerning the stock dividends listed by the trustee as corpus.' See also Restatement, Trusts, Sections 216 (2) (b) ; 219, Comment (c)." (Italics supplied.)

As to the second question above, counsel for the accountants states that insofar as the trustees are concerned the provisions of the deed of trust under discussion are not here involved and that they have elected to apportion dividends according to the Pennsylvania rule.

Since the accountants have indicated that the statement of their account is not intended as an exercise of their discretion to apportion dividends under section 4 of the deed of trust inter vivos, but that they intended that such dividends shall be apportioned according to the applicable law of Pennsylvania on the subject, the trustees have left it to the court to apply the law to the facts of the case. In this state of the record we are required to apply the so-called Pennsylvania rule of apportionment which was in effect prior to the Act of 1945, since this act and a similar Act of 1947 may not be applied to trusts in existence prior to such leg-

islation. Pew Trust, 362 Pa. 468, 469 (1949), states as follows:

"These are appeals from a decree of an orphans' court. The account was by trustees of an inter vivos trust. Exceptions of the life tenants to the adjudication were sustained, while those of the remaindermen and of the trustees were dismissed. These appeals followed.

"By sustaining the *life tenants*' exceptions and dismissing those of the *remaindermen*, the court below correctly determined that the provisions of the Uniform Principal and Income Act of May 3, 1945, P. L. 416, 20 PS 3471, and the Principal and Income Act of July 3, 1947, P. L. 1283, 20 PS 3470, are unconstitutional when applied *retroactively* to trusts created prior to their enactments: See Crawford Estate, 362 Pa. 458, 67 A. 2d 124."

Considering the third question presented, the court is of the opinion that the purchase price should be used in determining the intact value; that the life tenant is entitled to share in a stock dividend to the extent that it represents earnings during the period the stock was held in trust and to the extent that it does not impair the intact value which, as to stock purchased by the trustees, is the purchase price.

The purchase price of stock bought by the trustees was paid out of principal as the account shows. The remaindermen are entitled to have that sum preserved and eventually restored to principal. To hold otherwise would render it a simple matter for the trustees to divert a substantial portion of the corpus of the trust to the benefit of the life tenant. If the trustees were to purchase stock selling on the market at a price in excess of book value and then resell, if book value of that stock were held to be the intact value and if the earnings of the corporation issuing the stock were not considered, the life tenant would receive the difference

between the purchase price and book value at the time of purchase, thus diverting the corpus to the life tenant and thereby defeating the purpose of the settlor.

Robert Brigham, a member of the Philadelphia bar and a recognized authority on this branch of the Pennsylvania law of decedents' estates, is in accord with the position that the purchase price of corporate stock purchased by trustees constitutes intact value. In an article entitled "Pennsylvania Rules Governing the Allocation of Receipts Derived by Trustees from Shares of Stock", 85 University of Pa. Law Review 358, Mr. Brigham makes the following statement at page 361:

"However, there is an inconsistency which has crept into the recent cases. If the trustee acquired the shares from the testator, their *book value* is prima facie their intact value. If, on the other hand, the trustee *purchased* the shares, the cases indicate that the *purchase price*, and not the book value at the date of purchase, is the intact value. The purchase price is of course merely the market value and therefore, in this one instance, intact values are actually determined by market values, in spite of the reiterated statements that market value has nothing to do with intact value. Perhaps this result, although logically inconsistent, does substantial justice, because the trustee has actually paid out money and because this expenditure should be preserved for the remaindermen. Otherwise, it might not be preserved if, as is frequently the case, the shares were purchased at a price in excess of their book value."

Professor Austin W. Scott cites the case of Hostetter's Trust, 319 Pa. 572 (1935), as authority for the following statement in note 4, page 1310, of vol. 2 of his authoritative Law of Trusts:

"Where the stock was not received from the settlor but was subsequently purchased by the trustee for the

trust, the intact value is the purchase price rather than the book value at the time of the purchase."

Hostetter's Trust, 319 Pa. 572, also holds that the cost of shares purchased by a trustee is to be treated as the intact value of the purchased shares which is to be preserved for the remaindermen. In that case 1,300 shares of Pennsylvania Railroad stock were placed in an inter vivos trust in 1920. At that time the book value of that stock was $78.60 a share, making the total book value of the stock at the inception of the trust $102,180. In 1928 the company granted its stockholders the right to subscribe for additional shares at $50 a share in the ratio of 1 for each 8 shares held. The trustee exercised these rights and thereby acquired 162 new shares for which it paid $8,100. In 1929 the company issued similar rights which were again exercised by the trustee and thereby it acquired 183 shares for which it paid $9,150. Immediately after the second rights the book value of the stock was $91.65 a share. At the completion of the second subscription there were 1,645 shares of stock in the trust with a total book value of $150,764.25. It was held that the intact value which was to be preserved for the remaindermen was the sum of $102,180 (the original book value of the stock placed in trust at its creation) and $17,250, the price paid for the new stock purchased through the rights, or $119,430. At $91.65 a share, the book value after the second issuance of rights, to preserve an intact value of $119,430 would require 1,304 shares and that was the number awarded to corpus by the courts. The opinion is, in part, as follows (page 576) :

"In giving to the life tenant the surplus shares over that necessary to keep the value of the shares at the date of the trust *plus that amount expended for purchase of the additional shares*, no harm was done to remainder interests. The corpus of the estate must be credited with the *amount taken therefrom for the pur-*

*chase of the stock,* $17,250, and this new intact value must be preserved for the benefit of the remainder. . . ."

Bullitt's Estate, 308 Pa. 413, involved, inter alia, stock which had been purchased by trustees. Our Supreme Court in calculating the apportionment which it there directed to be made took the purchased stock at its *cost.* Testator there placed his residuary estate in trust for life tenants and remaindermen. Included in testator's residuary estate were 1,150 shares of Virginia Coal & Iron Company stock which at the date of testator's death had a book value of $145.9259 a share. In 1918 a 33⅓ percent stock dividend was declared whereby the trustees received 383 additional shares. Immediately after the declaration of that stock dividend the book value of the stock was $218.332 a share. All that stock dividend was added to corpus by agreement of the parties at the time, thereby bringing the number of shares in the trust to 1,533. The trustees purchased 62 additional shares, bringing the total number of shares in the trust to 1,595. In 1928 the company declared a 100 percent stock dividend whereby the trustees received an additional 1,595 shares. A controversy arose between the life tenants and remaindermen over the ownership of the new 1,595 shares received in 1928. In resolving that controversy the Supreme Court said (pages 420-421):

"Following Jones v. Integrity Trust, 292 Pa. 149, in the purchase of stock under stock rights, the reasoning being parallel, there should have been added to the intact value of 1902, the book value of the 383 shares donated or awarded to the principal; this forms a new intact value as a basis for future distribution; *to it should be added the cost of the shares purchased since that time,* plus any contributed surplus or capital gains. See Waterhouse's Est., 308 Pa. 422.

"The 1928 stock dividend of 100 percent should be distributed as follows:

| | |
|---|---:|
| "Intact value of original 1,150 shares at $145.9259 a share ....................................... | $167,814.785 |
| "Book value of 383 shares stock dividend of 1918 at $218.332 a share ............................... | 83,621.539 |
| *"Cost of 62 shares purchased*...................... | 14,836.26 |
| | $266,272.584 |

"Add thereto
  Contributed surplus per share... $20.31
  Capital gains per share......... 5.7004

                              $26.0104 a share
  or 1,595 shares equal........................... 41,486.588

  Total ...................................... $307,759.172

for 3,190 shares, being the 1,595 original shares plus stock dividend of 1,595 shares. Each share would have an intact value of $192.92. After the 1928 dividend the book value of each share was $121.09, and for the 3,190 shares, $386,289.54. The difference, $78,530.37, between the intact value and the book value goes to income, which at $121.09 a share would be 648 shares plus $61.75 in cash as income. Appellant's share of this is 92 shares plus $78.01." (Italics supplied.)

Keeping the above conclusion in mind, let us examine the facts relating to the dividends to be apportioned.

The accountants contend that 373.09 shares of American Viscose Corporation should be apportioned to the life tenant. Schedule D of the petition for distribution indicates that the trustees purchased 500 shares of American Viscose Corporation on June 28, 1944; that on November 15, 1950, the trustees received 1,000 shares or a split of 2 for 1. The parties agree that in 1944 when the American Viscose Corporation stock was purchased it had a book value of $30.43 per share, without taking into account $3,490,500 carried on the corporation books as earned surplus reserved post-war

refunds of Federal excess profit tax or $42,000,000 carried as earned surplus segregated as a general reserve. In 1945 and 1949, prior to the stock dividend, these reserves were eliminated and the amounts thereof were restored to earned surplus. In 1946 the corporation issued stock in exchange for assets taken into the corporate books at the value of $9,690,257 in excess of the aggregate value of the stock so issued; the capital surplus thus created did not give rise to earnings in which the life tenant's estate may share. The parties agree that the trustees paid $24,235.87 for 500 shares of stock of the American Viscose Corporation on June 28, 1944, and that, as a result of the 2-for-1 split on November 15, 1950, the trustees received 1,000 shares of the stock of the corporation, each of which new shares had a book value of $46.02 immediately after the split. Thus the 1,000 shares so received by the trustees had a book value of $46,020 when received; this was $21,784.13 in excess of the purchase price of the stock of the corporation originally acquired by the trustees. The parties agree that only $17,169.98 of the increase of $21,784.13 is attributable to earnings.

The court is of the opinion that the trustee ad litem has properly contended that the purchase price of the stock of the American Viscose Corporation is its intact value. However, the first exception is based upon the contention that intact value is the only consideration in stock apportionment. A proper apportionment involves not only the determination of intact value but also the determination of whether the extraordinary dividend represents earnings during the period the stock was held in trust. The fact that the reserves were eliminated in 1945 and 1949 respectively in the corporation and restored to earned surplus did not give rise to "earnings" to which the life tenant was entitled. The law on this fact is covered in the article by Robert

Brigham, Esq., in 85 University of Pa. Law Review
358, 360, as follows:

"Although the general rules differ in certain impor-
tant respects, principally as to the burden of proof,
depending upon the particular occasion which makes
an apportionment necessary, the object of the Pennsyl-
vania rule is to give the life beneficiary all *earnings*
which have been accumulated by the corporation dur-
ing the period when the shares were held in the trust,
provided that the *intact value* of the investment is not
thereby impaired. These two concepts, namely, *intact
value* and *earnings*, are encountered in every appor-
tionment, and it is in their development that the recent
decisions assume such great importance. A thorough
analysis of these concepts will make it possible to treat
very briefly the more familiar general rules which de-
termine when the life beneficiary is, and when he is
not, entitled to an apportionment."

Since the book value of the American Viscose Cor-
poration stock held by the trustees immediately after
the 2-for-1 split was $21,784.13 in excess of the pur-
chase price, an apportionment can be made without
impairing the intact value of this stock. Since only
$17,169.98 of the above $21,784.13 is attributable to
earnings, the life tenant's estate is entitled to a suffi-
cient number of shares, at the book value of $46.02
per share, to give it stock of the value of $17,169.98,
i.e., 373.09 shares.

The trustee ad litem after further consideration of
the problem involved, has concluded that the account-
ants have correctly apportioned the American Viscose
Corporation stock and has withdrawn his exception to
the apportionment of this stock by the trustees.

The conclusion of the accountants as to the number
of shares of American Viscose Corporation allocable
to income is sustained and the first exception of the
trustee ad litem is dismissed accordingly.

The trustees purchased certain shares of Standard Oil Company of New Jersey on May 26, 1944. The dividends received are shown in schedule D of the petition for distribution. On June 12, 1951, the corporation changed its capitalization from 35,000,000 authorized shares of $25 par value to 70,000,000 shares of $15 par value and issued 2 new shares for each of the 30,285,546 old shares outstanding. To provide for the additional aggregate par value of its stock, the corporation as part of the 1951 recapitalization transferred to its "capital stock" account $151,427,730, of which $149,539,527 was transferred from an account called "capital surplus" and the remaining $1,888,203 was transferred from "earned surplus". The amount transferred from "capital surplus" represents in part undistributed earnings of the company: In connection with two stock dividends in 1948 there was transferred from current earnings to the "capital surplus" account $66,457,287; and in connection with a 1949 stock dividend there was transferred from current earnings to "capital surplus" the sum of $25,950,299, making a total thus transferred from current earnings to the "capital surplus" account of $92,407,586. The shares attributable to the $92,407,586 of earnings, and to the amount transferred from earnings to the "capital surplus" account in 1951, viz., $1,888,203, or a total of $94,295,789, are apportionable since they are derived from earnings. $94,295,789 is 62.27 percent of $151,427,730. Accordingly, 62.27 percent of the stock received in 1951 *in excess* of that which represented simply the stock returnable to the principal after the two shares for one share split should be allocated to income.

The 1951 transaction in effect was a combination split and stock dividend. Each shareholder gave up a share of $25 par value and received in exchange two shares of $15 par value, making an increase of $5,

which is equivalent to 5/30 of the new shares received. In other words, 25/30 of the new shares represented stock returnable to the principal on the basis of a stock split-up and 5/30, or 16⅔ percent, represented a stock dividend. This 5/30 is tantamount to a 16⅔ percent stock dividend. Sixteen and two-thirds percent of the new 2,142 shares received equals 357 shares, which are the shares subject to apportionment. Since 62.27 percent of the stock dividend of 357 shares is attributable to income, the life tenants are entitled to 62.27 percent of 357 shares or 222.30 shares of the stock of Standard Oil Company of New Jersey received in 1951.

The trustees should have allocated 222.30 shares of Standard Oil Company of New Jersey to the life tenant of the 2,142 shares held. The balance of 1,919.70 belongs to principal.

The life tenants' rights to earnings, when they are distributed in the form of additional stock in the company, are not altered by any bookkeeping methods used by the corporation. The fact that the Standard Oil Company of New Jersey, in its accounting, transferred $92,407,586 of undistributed earnings from its "earned surplus" account to "capital surplus" account has no effect on the apportionment of stock dividends. The life tenant is entitled to the earnings where there is no intact value impairment.

In determining the ownership between life tenants and remaindermen of a trust in additional stock received by trustees on an investment, the orphans' court should be guided by the actual source and nature of the funds represented by the new stock and not by the name applied to those funds by the corporation or by what appellation the corporation calls the account into which it has put the funds in the intricacies of its own accounting procedures. This view is not only consonant with fundamental equities, but is also required by decisions of the Pennsylvania appellate courts.

The case closest in point of fact appears to be Cassatt's Estate: 105 Pa. Superior Ct. 14. Testator there bequeathed stock in the Norfolk & Western Railroad Company to trustees to pay the income therefrom to life tenants and the principal ultimately to remaindermen. Twenty-three years after testator's death the trustees sold a portion of the stock at a large profit and filed an account. After awarding sufficient of the proceeds of the sale to the principal of the trust to maintain its intact value, there remained a profit of some $43,000 which the orphans' court awarded partly to the life tenants and the balance to the remaindermen. All the profits reflected in the sale were on account of earnings which the railroad company had accumulated since testator's death. The railroad company divided its undistributed profits between two accounts, one known as its "unappropriated surplus" and the other as its "appropriated surplus", the latter meaning earnings which had been used by the company to add entirely new permanent improvements to its property. The orphans' court had adopted said accounting practice of the railroad as the basis for its distinction between what belonged to income and what to corpus, and accordingly awarded that portion of the proceeds of the sale allocable to the "unappropriated surplus" of the railroad to the life tenants, and the part allocable to the "appropriated surplus" to the remaindermen. The Superior Court reversed, holding that all the profits from the sale of the stock after awarding sufficient thereof to the principal to maintain its intact value should be awarded to the life tenants, appellants. Speaking through Judge (later Justice) Linn, the court said (pages 16-17):

"The learned court below in its adjudication frankly stated that the application of the doctrine of Nirdlinger's Estate, 290 Pa. 457, would require that the entire income be awarded to the life tenant, but sought to

avoid the logical result of the application of the rule, by holding that the corporation had certain discretion in the management of its affairs; that this discretion could be, and in this instance was, finally exercised, as between company and stockholder, by appropriating the earnings in dispute, (in the words of the court), 'for entirely new and permanent additions to the property. These earnings were by the process changed from earnings to productive capital. . . .' But that position takes no account of the fact that the trustees have brought in for present distribution a sum which 'reflects' (as was said in Nirdlinger's Est., supra) 'substantially a distribution by the corporation of its accumulated earning' (p. 469) ; if the value of the principal is now increased by part of what (as conceded) would be income but for the bookkeeping of the corporation, the remaindermen will receive what they are not entitled to, and the life tenants will receive less than the will gave them. Such a result cannot be supported."

In the course of its exhaustive opinion in Nirdlinger's Estate, 290 Pa. 457, the Supreme Court said as to the present question (page 470) :

"Where the earned accumulations remain in the company undisposed of, the shareholders' interest therein and right thereto is undisturbed; no matter what such accumulations may be called by the corporation or what form they may assume, the names do not aid in determining the rights of the life tenant and remaindermen to such income."

In the same case after quoting from McKeown's Estate, 263 Pa. 78, 84, the Supreme Court tersely said (page 471) :

"We are not interested in the conduct of the affairs of the corporation."

The second exception filed by the trustee ad litem is sustained.

The trustees purchased certain shares of Texas Company stock. The apportionment problem arises from certain dividends received by the trustees. In June 1951, the trustees received 1,025 shares as a 100 percent stock dividend. This stock dividend represented the capitalization of both earned and capital surplus by the Texas Company: $344,940,600 being transferred to its "capital stock" account, of which $211,837,243 was transferred from "earned surplus" and $133,103,357 was transferred from "capital surplus". The amount transferred from "capital surplus" represents in part undistributed earnings of the company. In connection with a two-and-a-half percent stock dividend in 1948 there was transferred from current earnings to "capital surplus" the sum of $11,105,424, representing the excess of assigned value of $58 per share over the $25 par value of the shares distributed as a stock dividend. The shares attributable to said $11,105,424 of earnings, plus the amount transferred from "earned surplus" in 1951, $211,837,-243, or a total of $222,942,667, are apportionable, since they are derived from earnings; $222,942,667 is 64.63 percent of $344,940,600. Accordingly, 64.63 percent of the 1,025 shares received in 1951 is attributable to earnings and should be apportioned to the life tenant, provided intact value is not impaired. Use of this percentage, rather than the percentage of 61.41 percent used by the trustees, would result in an apportionment of 662.46 shares to the estate of the life tenant, rather than 629.45 shares.

If 662.46 shares are so apportioned, 1,387.54 shares, having a book value of $42.29 per share, or $58,679.07, will remain as principal. According to exhibit D the intact value of this stock is $56,468.09, so such apportionment would not impair intact value. The trustees should have allocated 662.46 shares of the

Texas Corporation, instead of 629.45 shares, to income. The third exception is sustained.

The third and final account shows that the trustees received 2,000 rights to subscribe for 3.7 percent convertible debentures of the Phillips Petroleum Company. The trustees sold the same for $125. Since the intact value, in accordance with exhibit C, would not be impaired, the proceeds of the sale should be credited to the life tenant. The proceeds of the sale of such rights are apportionable on the same basis as stock or other extraordinary dividends: Waterhouse's Estate, 308 Pa. 422. Accountants now agree that the $125 was income. Accordingly, the fourth exception is sustained.

A decree will be drawn in accordance with this opinion.